THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PABLO VARGAS BADILLO, Defendant and Appellant.

No. 11664. Argued March 12, 1947.—Decided April 1, 1947.

*R. Rivera Zayas* and *G. Rivera Cestero* for appellant. *Luis Negrón Fernández, Acting Attorney General,* and *J. Correa Suárez, Assistant Prosecuting Attorney,* for appellee. *Miguel Guerra-Mondragón* for American Union of Civil Liberties and *Benjamín* and *Alonso Ortiz* for Press Association of Puerto Rico, as *amici curiae.*

MR. CHIEF JUSTICE TRAVIESO delivered the opinion of the Court.

On September 10, 1946, Judge Arcilio Alvarado of, the District Court of San Juan, ordered the arrest of Pablo Vargas Badillo, Editor of the newspaper "El Mundo," and set the 17th of that same month for the defendant to appear and show cause why he should not be punished for contempt. Not being satisfied with the reasons adduced by the defendant, Judge Alvarado found him guilty of a criminal contempt and sentenced him to pay a fine of one dollar or to serve one day in jail. The defendant thereupon took the present appeal. The facts which gave rise to this prosecution are as follows:

The district attorney filed, in the Municipal Court of San Juan, two informations against Basilio Carrasquillo, a merchant, and his clerk, Alberto Carrasquillo, the first for having sold a pound of rice at 10 cents when the legal price was 9 cents, and the second for having sold a can of tomato sauce at 11 cents when the legal price was 8 cents. The municipal court found both defendants guilty and sentenced Basilio Carrasquillo, the alleged owner of the establishment, to pay a fine of one hundred dollars and to serve three months in jail, and sentenced Alberto Carrasquillo, the clerk who made the sales, to pay a fine of seventy-five dollars in each case. After both cases were tried de novo before the District Court, presided by Judge Alvarado, the latter sustained a motion of the defense for the peremptory acquittal of Basilio Carrasquillo, and acquitted that defendant.

In the issue of "El Mundo" pertaining to September 7, 1946, there appeared the following news item:

"A MERCHANT WAS ACQUITTED YESTERDAY IN THE CAPITAL.—He had been convicted by the municipal court.—Details of the case.—Judge Arcilio Alvarado, of the District Court, yesterday acquitted Basilio Carrasquillo Quiñones, a merchant, who was charged with two violations of the Price Control Act.— The Assistant District Attorney, Domingo Candelario, had jointly charged Carrasquillo Quiñones and Alberto Carrasquillo with having sold a pound of rice at

10 cents when its legal price was 9 cents, and a can of tomato sauce at 11 cents when its legal price was 8 cents. After both cases were tried in the Municipal Court of San Juan, before Judge Victoriano Fernández, the latter sentenced Basilio Carrasquillo Quiñones to pay a fine of one hundred dollars and to serve three months in jail, and Alberto Carrasquillo to pay a fine of seventy-five dollars in each case. Attorney Gustavo Marrero Ledesma appealed both cases of Basilio Carrasquillo Quiñones to the district court. After the evidence in these cases was heard, Judge Alvarado found the defendant merchant not guilty 'because he had doubts as to whether the merchant was the real owner of the business where these purchases were alleged to have been made, nor was he sure that said purchases were made in his presence.''

In the issue of September 10, 1946, of that same newspaper, there appeared an editorial entitled ''A Dangerous Precedent,'' in which the case of merchant Carrasquillo was discussed and it was again stated that Judge Alvarado acquitted that defendant because ''he had doubts as to whether the merchant was the real owner of the business where these purchases are alleged to have been made, nor was he sure that said purchases were made in his presence.'' The editorial goes on to state, in brief, that the decision of Judge Alvarado establishes the rule that ''in order that the owner of a business may be found guilty of profiteering it must be proven that he was present when the transaction was made''; that if this rule should prevail, the control of prices would be very difficult; that said judgment leaves a loophole through which the profiteers may freely escape; and that there are decisions of this Court which, in the opinion of the editor, preclude an acquittal by reason of the absence of the owner from the establishment. After quoting excerpts from the opinion of this Court, in the case of *People* v. *Díaz* 62 P.R.R. 130, delivered by Mr. Justice Snyder, the editorial goes on to invite Judge Alvarado to examine said opinion, and ends with these words:

''Being aware, as we are, of the firmness with which Judge Alvarado enforces the Price Control Act, it is unquestionable that he

will clearly see our intention to aid, modestly, in preventing the formation of loopholes through which those who exploit public necessity may escape. It is very far from our intention to establish legal doctrines; but our earnest desire to help exterminate the black market, encourages us to offer these considerations which we hope will be regarded in a like spirit."

Doubtless more irritated by the editorial than by the news item published three days previously, Judge Alvarado took summary action against the editor of "El Mundo," and stated in the order issued on that same day, September 10, 1946, that "the report published by 'El Mundo' on September 7, 1946, regarding the grounds on which the court relied for acquitting defendant Basilio Carrasquillo Quiñones is untrue and constitutes a false report of a judicial proceeding, which tends to impair the prestige of the Court, thus undermining the administration of justice; and in the editorial comments published in that same newspaper, issue of September 10, 1946, based on said false report, the court is made to appear as violating the decisions of the Supreme Court of Puerto Rico and creating loopholes which would enable the profiteers to escape criminal responsibility." Considering the contents of both publications as constituting *prima facie* a contempt of the court presided by him, Judge Alvarado ordered the arrest of the editor of the offending newspaper.

At the hearing held before this Court, oral arguments were submitted by counsel for appellant and also by the representatives of the American Union of Civil Liberties and of the Press Association of Puerto Rico, as *amici curiae.* The distinguished representatives of the defendant and of the above-mentioned associations, in extensive and brilliant briefs, raised numerous legal questions, many of which we will not discuss, as we do not deem said discussion necessary for the decision of the case.

We will first examine the Act under which the present proceeding for contempt was instituted.

 Section 1 of the Act of March 1, 1902, "Defining the offense of contempt of court and providing for the punishment thereof," as amended by the Act of March 8, 1906, and incorporated in the Penal Code in force (§ 145), provides that the district courts shall have the power to punish for contempt any person guilty, among others, of the following act:

"5. *Inaccurate Publication.* The wilful publication of any false or grossly inaccurate report of judicial proceedings: *Provided, however,* That the publication of any true and fair report of any judicial proceeding shall not be punishable as a contempt."

The complaint filed by Judge Alvarado against the appellant, as we have already seen, is based on the ground that "the report published by 'El Mundo' on September 7, 1946, regarding the grounds on which the court relied for acquitting defendant Basilio Carrasquillo Quiñones *is untrue* and constitutes a *false report of a judicial proceeding,* etc." We will put aside for the moment the allegations of the complaint which refer to the editorial of September 10, since the trial judge stated, before the evidence was introduced, that the proceeding would not at all be prosecuted on the basis of what had been set forth in said editorial "but this prosecution will be proceeded with upon the report contained in the issue of September 7, in so far as it is charged that said report is false."

Assuming, without holding, that the news published on September 7 might and should be considered as "the wilful publication of a false or grossly inaccurate report" of the proceeding brought against Basilio Carrasquillo Quiñones, the first question which we must consider and decide is: Has the district court power to punish as for contempt the publication of a false or inaccurate report of a judicial proceeding which has already ended by a judgment of acquittal, from which no appeal could be taken? Let us examine the decisions.

The case of *People of Virgin Islands* v. *Brodhurst*, 148 F. 2d 636, decided by the Circuit Court of Appeals for the Third Circuit, involved a situation identical to the one presented by the instant case. Before the District Court of the Virgin Islands, without the intervention of a jury, a trial was held in a prosecution for murder against a white man charged with having killed a negro. The defendant was acquitted by Judge Moore, a member of the negro race. Four or five days after the judgment of acquittal was entered, the newspaper "The St. Croix Avis" published an editorial article that contained violent and insulting comments on the judicial proceeding taken before the district court and which had ended with the acquittal of the defendant. For a better understanding of the nature of said article, we copy the following paragraphs thereof:

"As the mass left the Court Room last Wednesday after having heard the decision of the case of Harry Beatty by Judge Moore, there were cries of discontent and indignation.

" 'What have we left?', they said. 'Justice even is against us'. We are the masses of this island but we are trampled under heels of the Hitlerites and bribe and injustice rule out reason. . . .

". . . Here in St. Croix the trend is Justice versus poverty."

Relying on the provisions of the St. Croix Code, which are identical to those of our Code, Judge Moore in a summary proceeding against Brodhurst, editor of the newspaper, adjudged him guilty of contempt and sentenced him to serve ten days in jail.

After deciding that the St. Croix statute authorizes summary punishment for contempts committed within the immediate presence of the court as well as for those committed out of its presence, the Circuit Court proceeded to consider and decide the fundamental question raised by the appellant, that is, whether the St. Croix Code is, to the extent that it authorizes such summary punishment, inconsistent with the freedom of speech and of the press guaranteed by the Organic Act against abridgment by insular legislation.

The St. Croix Code went into effect on August 1, 1920. The Organic Act, in force since June 22, 1936, provides by its § 18 that "The laws of the United States applicable to the Virgin Islands on the date of the enactment of this Act, and all legal laws and ordinances in force on such date in the Virgin Islands, not inconsistent with this Act, shall continue in force and effect." Section 34 of the Virgin Islands Organic Act, which contains the Bill of Rights of the inhabitants of said island, provides that "No law shall be passed abridging the freedom of speech or of the press. . ."

In reversing the judgment appealed from, the Circuit Court said:

". . . . By the sentence just quoted the Organic Act guarantees to the inhabitants of the islands in the very language of the First Amendment to the Constitution of the United States the same freedom of speech and of the press which is safeguarded to the inhabitants of the United States by the First and Fourteenth Amendments. The construction which has been placed upon those amendments is, therefore, determinative as to the interpretation and effect of the language of the Organic Act.

"The extraordinary power of a court to impose summary punishment for criminal contempts of its authority is based upon the necessity for speedily and adequately dealing with conduct which obstructs the procedure of the court and prevents it from carrying out its judicial functions. It was because of the importance of enabling the judicial branch of the government to perform unimpeded its high constitutional functions that the safeguards ordinarily applied in criminal cases were relaxed in this situation. (Citing authorities.) Although directed primarily to obstructive conduct in the presence of the judge the power was early extended to include constructive contempts committed out of the presence of the court *but which were nevertheless found to obstruct its processes or impair its authority.*

"* * * * * * *

". . . The use of the contempt power in the case of publications involving merely defamatory criticism of the court or judge has been much criticized in England. In this country it runs squarely afoul of the constitutional guarantees of the right to speak and print freely in criticism of the conduct of public officers, judges as well as others. For these guarantees are but an expression of the belief of the founders

of our nation that the preservation of freedom to criticize the acts of public officials is essential to the maintenance of democratic control over the processes of government.'' (Italics ours.) (P. 643.)

The Circuit Court reached the conclusion that the provisions of the St. Croix Code (Title IV, chapter 4, § 35–3) under which the proceeding against Brodhurst was taken and in which only publications which are scurrilous and tend to present the court or any of its members into undeserved disrepute, are defined as criminal contempts did not survive the introduction into the Virgin Islands, through § 34 of the Organic Act, of the constitutional guarantees of free speech and a free press but were repealed by § 18 of that same Organic Act. The opinion which we are discussing ends thus:

''Finally, it should be pointed out that the action of the District Court can not be supported upon the theory that the publication was in fact obstructive of its processes and therefore within its inherent power to punish as contempt. For the Beatty trial, the judicial proceeding which the publication criticized, *had been terminated by Beatty's acquittal five days before the article appeared and obviously could not have been obstructed by it.*'' (Italics ours.) (P. 644.)

The Federal Supreme Court recently (1941), after a careful study of the historical background of the power to punish for contempt and of the limitation of that power by the constitutional rights of freedom of speech and of the press, established a rule which, in our judgment, is applicable to the determination of the present case. In *Bridges* v. *California,* 314 U. S. 252, 86 L. ed. 192, the petitioners had been convicted and fined for contempt of court, which consisted in their having published certain comments pertaining to a case then pending before the Superior Court of Los Angeles. The trial court based its judgments on the alleged inherent power of the courts of justice to punish as for contempt ''publications made outside the court room if they tend to interfere with the fair and orderly administration of justice in a pending case.'' It was urged in support of the judgments sought

to be reviewed, that even though the punishment imposed "constitutes a restriction on the liberty of expression, the public interest in that liberty was properly subordinated to the public interest in judicial impartiality and decorum."

The question thus submitted to the Supreme Court was not a trivial one. Since free speech and fair trials are two of the most cherished accomplishments of civilization, it was not an easy task to decide which of the two should prevail and which should be subordinated to the other. The judgments of conviction were reversed, the Court saying:

". . . This is not, however, solely an issue between state and nation, as it would be if we were called upon to mediate in one of those troublous situations where each claims to be the repository of a particular sovereign power. To be sure, the exercise of power here in question was by a state judge. But in deciding whether or not the sweeping constitutional mandate against any law 'abridging the freedom of speech or of the press' forbids it, we are necessarily measuring a power of all American courts, both state and federal, including this one. (P. 260.)

* * * * * * *

"We are aware that although some states have by statute or decision expressly repudiated the power of judges to punish publications as contempts on a finding of mere tendency to interfere with the orderly administration of justice in a pending case, other states have sanctioned the exercise of such a power. (Citing authorities.) But state power in this field was not tested in this Court for more than a century. Not until 1925, with the decision in *Gitlow* v. *New York, supra,* 268 U. S. 652, did this Court recognize in the Fourteenth Amendment the application to the states of the same standards of freedom of expression as, under the First Amendment, are applicable to the federal government. And this is the first time since 1925 that we have been called upon to determine the constitutionality of a state's exercise of the contempt power in this kind of situation. Now that such a case is before us, we cannot allow the mere existence of other untested state decisions to destroy the historic constitutional meaning of freedom of speech and of the press." (Pp. 267–8.)

The editorial published in "The Los Angeles Times," after vigorously denouncing two members of a labor union

convicted of having assaulted two nonunion workmen, ended by saying: "Judge A. A. Scott will make a serious mistake if he grants probation to S. and H. This community needs the example of their assignment to the jute mill." The editorial was published about a month prior to the date set by Judge Scott to pass upon the application for probation. The publication was punished as contempt, according to the trial court, because "of its inherent tendency" and, according to the Supreme Court of California, because of its "reasonable tendency" to interfere with the orderly administration of justice in an action pending before a court for consideration. After stating and discussing the facts, the Federal Supreme Court went on to say:

"For these reasons we are convinced that the judgments below result in a curtailment of expression that cannot be dismissed as insignificant. If they can be justified at all, it must. be. in terms of some serious substantive evil which they are designed to avert. The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

"The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases." (Pp. 270–71.)

A minority of the Court—Justices Frankfurter, Stone, Roberts, and Byrnes—were of the opinion that the publications were and should be punished as a contempt of the lower court. From the dissenting opinion, written by Mr. Justice Frankfurter, we copy the following:

"Comment however forthright is one thing. Intimidation with respect to specific matters *still in judicial suspense*, quite another. . . . A publication intended to teach the judge a lesson, . . . or to discredit him, or to influence him in his future conduct, would not justify exercise of the contempt power. . . . *It must refer to a matter under consideration and constitute in effect a threat to its impartial disposition.* . . . But to interfere with justice it need not succeed. As with other offenses, the state should be able to proscribe attempts that fail because of the danger that attempts may succeed. The purpose, it will do no harm to repeat, is not to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed. The purpose is to protect immediate litigants and the public from the mischievous danger of an unfree or coerced tribunal. The power should be invoked only where the adjudicatory process may be hampered or hindered in its calm, detached, and fearless discharge of its duty on the basis of what has been submitted in court. The belief that decisions are so reached is the source of the confidence on which law ultimately rests." (Italics ours.) (Pp. 291–2.)

The opinion of the Supreme Court was unanimous as to the power of the courts, either under the doctrine of inherent power or under statutory provisions, to punish as for contempt the publication of any report which tends to intimidate, obstruct, or influence the courts in the ordinary administration of justice in pending cases. The opinion was also unanimous as to the lack of such power when the publication, no matter how false or libelous it might be, refers to a judicial proceeding already ended. The divergence of opinion arose as to whether or not the publication in The Los Angeles Times, which referred to a matter pending decision, tended to influence or obstruct the administration of justice.

In *Pennekamp et al.* v. *Florida,* 328 U. S. 331, the editor of the "Miami Herald" applied for the review of a judgment of guilt in contempt of a Circuit Court of Florida which had been affirmed by the Supreme Court of that State. In two editorials and a cartoon published in said newspaper, a severe criticism was made of certain decisions previously rendered by the trial court, as being too favorable to criminals and gambling establishments. Two of the cases involved had been dismissed. In the third, a rape case, an indictment had been quashed for technical defects, but a new indictment had been filed and the case was still pending. The citation for contempt charged that the publications reflected upon and impugned the integrity of the court, tended to create a distrust for the court, wilfully withheld and suppressed the truth, and tended to obstruct the fair and impartial administration of justice in pending cases.

The judgment of the Supreme Court of Florida was reversed by a unanimous decision of the Federal Supreme Court. From the opinion of the Court, delivered by Mr. Justice Reed, we copy the following:

"*Bridges* v. *California* fixed reasonably well marked limits around the power of courts to punish newspapers and others for comments upon or criticism of pending litigation. The case placed orderly operation of courts as the primary and dominant requirement in the administration of justice. This essential right of the courts to be free of intimidation and coercion was held to be consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order. A theoretical determinant of the limit for open discussion was adopted from experience with other adjustments of the conflict between freedom of expression and maintenance of order. This was the clear and present danger rule. The evil consequence of comment must be 'extremely serious and the degree of imminence extremely high before utterances can be punished.' (P. 334.)

" " * * * * * * *

"The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that

instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat · of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. When the highest court of a state has reached a determination upon such an issue, we give most respectful attention to its reasoning and conclusion but its authority is not final. Were it otherwise the constitutional limits of free expression in the Nation would vary with state lines.

"While there was a division of the Court in the *Bridges* case as to whether some of the public expressions by editorial comment transgressed the boundaries of a free press and as to the phrasing of the test, there was unanimous recognition that California's power to punish for contempt was limited by this Court's interpretation of the extent of protection afforded by the First Amendment. (Pp. 335–6.)

‹ ‹❋ ❋ ❋ ❋ ❋ ❋ · ❋ ·

"What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly this criticism of the judges' inclinations or actions in these pending non-jury proceedings could not directly affect such administration. This criticism of their actions could not affect their ability to decide the issues. Here there is only criticism of judicial action already taken, although the cases were still pending on other points or might be revived by rehearings. For such injuries, when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants." (Pp. 348–9.)

An examination of the facts herein, as they appear from the transcript of the evidence in the case against Carrasquillo, shows that the report published on September 7 is not false, nor inaccurate to the extent of deserving to be characterized as grossly inexact. The record shows that if there was any inaccuracy in the news item, it was brought about by the lack of clearness or precision in the decision on the motion for nonsuit. Let us see what appears from the record. At the

conclusion of the evidence for the prosecution, counsel for defendant said:

"Nonsuit. We think that it has not been proven that Basilio Carrasquillo is the owner, or that he, jointly with his brother, has made sales at an overprice.

"Judge: The motion for nonsuit is sustained. The court considers that the defendant has not been connected in a satisfactory way."

If it is borne in mind that, prior to the motion for nonsuit, the district attorney and defense counsel had argued at length the legal question of whether the district attorney was bound to prove the personal intervention of the owner of the establishment in the illegal sale in order to warrant a conviction, without the judge making any ruling indicative of his opinion, it must be concluded that the reporter who drafted the news was justified in believing, and so publishing, that the acquittal of Carrasquillo had been based on the two grounds of the motion for his peremptory acquittal, to wit, (a) that it had not been proven that he was the owner, and (b) that his intervention in the illegal sale made by his employee had not been proven either. Even though the judge was not technically bound to be more explicit, in view of the public interest in such cases at that time, and of the grave consequences of a holding in the sense that an owner, who is not present at the sale, is not criminally liable, it would have been better for the public interest if the judge had taken care to be more explicit in his decision. In any event, a news writer, whose mission is to inform his reading public concerning matters of public interest, can not be expected to possess the power of guessing what the trial judge had in mind, but failed to express, when he rendered his decision. If the judge in deciding the motion had said: "Motion sustained. It has not been proved that the defendant was the owner of the establishment," the mistake made by the newspaperman would have been avoided. It was not until after the publication of the editorial that the trial judge, in the citation for contempt, revealed for the first time that the acquittal had

been based solely on the insufficiency of the evidence as to the ownership of the business by the defendant.

Applying to the facts of this case the rule laid down by the decisions which we have discussed, we fail to find in the news article published anything which might be regarded as a clear and imminent peril to the fair and impartial administration of justice.

We further hold that, even if said news article were untrue or should involve an unjust criticism of Judge Alvarado, the lower court lacked power to render the judgment appealed from, inasmuch as the publication was made when the proceeding against the merchant Carrasquillo had already been terminated by a judgment of acquittal. Moreover, the power to punish as for contempt the publication of a report concerning a judicial proceeding, granted to our courts by § 145 of the Penal Code, *supra,* is unconstitutional and void as to judicial proceedings already ended, since it is contrary to the Bill of Rights, § 2 of the Organic Act of Puerto Rico, which guarantees freedom of speech and of the press, and is in conflict with the rule laid down by the Federal Supreme Court in the cases cited in this opinion.

This Court will always be ready to punish as contempt any abuse of the freedom of expression, when its purpose be to intimidate the judges or to obstruct in a clear and substantial manner the judicial proceedings in cases pending before the courts. The liberty of the press is essential for the existence of a democratic form of government. History has proven to our satisfaction that dictatorships and a free press can not co-exist. But freedom of speech and of the press is not an absolute freedom, because "no institution, either governmental or private, can have absolute power"; and "freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise." (Concurring opinion of Mr. Justice Frankfurter in *Pennekamp* v. *Florida, supra,* pp. 355–6). But in order that a publication may be punished as contempt, as

stated by Mr. Justice Rutledge in his concurring opinion in the *Pennekamp* case (p. 372), "it is not enough that the judge's sensibilities are affected or that in some way he is brought generally into ubloquy. After all, it is to be remembered that it is judges who apply the law of contempt, and the offender is their critic."

■ We do not deem it necessary to consider or decide whether the courts of Puerto Rico have the inherent power to punish for contempt, or whether they have only such power as is granted to them for that purpose by the law in force, since even if we should decide that our courts are vested with inherent power, that power could never be extended to punish as for contempt the publication of a report, however false or defamatory it may be, if the same refers to a judicial proceeding already ended.

The decision in *People* v. *Lastra,* 50 P.R.R. 114, in so far as it holds that by statutory provision as well as under the doctrine of inherent power, the courts may punish as contempt the publication of any false or clearly inaccurate report concerning any judicial proceeding, even when the latter has ended, is in conflict with the decisions of the Federal Supreme Court in the *Bridges* and *Pennekamp* cases, and should be considered as overruled.

The judgment appealed from should be reversed and the defendant acquitted.